UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

U.S. DISTRICT COURT
DISTRICT OF NH
FILED

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 2016 JUL -5  A 10: 43 |
| | ) | |
| v. | ) | No. 1:16-cr-00007-PB |
| | ) | |
| AUDI N. SUMILAT | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, Emily Gray Rice, the United States Attorney for the District of New Hampshire, and the defendant, Audi N. Sumilat, and the defendant's attorney, Richard F. Monteith, Jr., Esquire, enter into the following Plea Agreement:

1. The Plea and The Offense.

The defendant agrees to plead guilty to Count One of the Indictment charging him with Conspiracy to Make False Statements in Connection with the Acquisition of a Firearm, to Make False Statements in Records Federal Firearms Licensees are Required to Keep and to Smuggle Goods from the U.S. in violation of Title 18, United States Code, Section 371.   The defendant further agrees to the sentencing stipulations specified in section 6 of this plea agreement.   In exchange for the defendant's guilty plea, the United States agrees to the sentencing stipulations specified in section 6 of this agreement.

2. The Statute and Elements of the Offense.

Count One of the Indictment charges the defendant with Conspiracy to Make False Statements in Connection with the Acquisition of a Firearm, to Make False Statements in

1

Records Federal Firearms Licensees are Required to Keep and to Smuggle Goods from the U.S. in violation of Title 18, United States Code, Section 371.   Title 18, United States Code, Section 371, provides, in pertinent part, as follows:

> If two or more persons conspire … to commit any offense against the United States … and one or more of such persons do[es] any act to effect the object of the conspiracy, each shall be [guilty of a crime].

18 U.S.C. § 371.   The crime of Conspiracy, as defined in Title 18, United States Code, Section 371, and in the context of this case, has the following elements, each of which the government would be required at trial to prove beyond a reasonable doubt:

> First, that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to make a false statement in connection with a firearm purchase, to make false statements in records federal firearms licensees are required to maintain, or to smuggle firearms from the United States;

> Second, that the defendant willfully joined in that agreement; and

> Third, that one of the conspirators committed an overt act during the period of the conspiracy in an effort to further the purpose of the conspiracy.

*Pattern Jury Instructions: First Circuit, Criminal Cases, Hornby, 4.18.371(1) (2015).*

The alleged conspiracy has three illegal objects.   The first illegal object of the alleged conspiracy is Making False Statements in Connection with the Acquisition of a Firearm in violation of Title 18 United States Code, Section 922(a)(6).   Title 18, United States Code, Section 922(a)(6) provides in pertinent part as follows:

> It shall be unlawful -- … for any person in connection with the acquisition or attempted acquisition of any firearm … from a licensed … dealer, knowingly to make any false or fictitious oral or written statement … intended or likely to deceive

2

such ... dealer ... with respect to any fact material to the lawfulness of the sale or other disposition of such firearm.

18 U.S.C. § 922(a)(6). The crime of Making False Statements in Connection with the Acquisition of a Firearm as defined in Title 18 United States Code, Section 922(a)(6), has the following essential elements:

First, that the defendant knowingly made a false statement as charged in the indictment;

Second, that at the time he made the statement, the defendant was trying to buy a firearm from a licensed dealer; and

Third, that the statement was intended to, or likely to, deceive the licensed dealerabout a fact material to the lawfulness of the sale.

*Pattern Jury Instructions: First Circuit, Criminal Cases, Hornby, 4.18.922(a) (2014).*

The alleged conspiracy's second illegal object is Making False Statements in Records Required to be Maintained by Federal Firearms Licensees in violation of Title 18, United States Code, Section 924(a)(1)(A). Title 18, United States Code, Section 924(a)(1)(A) provides in pertinent part as follows:

[W]hoever ... knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter ... [shall be guilty of a crime].

18 U.S.C. § 924(a)(1)(A). The crime of Making False Statements in Connection with the Acquisition of a Firearm as defined in Title 18 United States Code, Section § 924(a)(1)(A), has the following essential elements:

First, that the defendant made a false statement or representation;

Second, that the statement or representation concerned information required by law in the records of a federally licensed firearms dealer; and

Third, that the defendant did so knowingly.

*Pattern Jury Instructions for Federal Criminal Cases, South Carolina, 18 U.S.C. § 924(a)(1)(A), False Statements (2015).*

The third illegal object of the alleged conspiracy is Smuggling, or Attempting to Smuggle, Goods from the United States in violation of Title 18, United States Code, Section 554, which provides in pertinent part as follows:

Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be [guilty of a crime].

The crime of Smuggling, or Attempting to Smuggle, Goods from the United States as defined in Title 18 United States Code, Section § 554, has the following essential elements:

First, that the defendant knowingly exported or attempted to merchandise as described in the indictment;

Second, that the defendant's exportation was contrary to 22 U.S.C. § 2778(b)(2) and 22 C.F.R. § 127.1(a)(1) in that the export of the merchandise required a license which the defendant did not possess; and

Third, that the defendant knew the exportation of the merchandise was contrary to any law or regulation.

*Pattern Jury Instructions:   Fifth Circuit, Criminal Cases, Section 2.26 (2015).*
3. Offense Conduct.

4

The defendant stipulates and agrees that, if this case proceeded to trial, the government would prove the following facts and that those facts would establish the elements of the offense of Conspiracy as defined Title 18, United States Code, Section 641, beyond a reasonable doubt:

On November 11, 2015, a woman whose initials are T.B. visited the Dover, N.H., police station and, through an Indonesian translator, volunteered that her husband, Feky Ruland Sumual, was trafficking firearms.  In that and follow-up interviews, T.B. reported that Sumual purchased the firearms he trafficked from State Line Guns, Ammo & Archery, Sig Sauer Academy and Kittery Trading Post (KTP) – all New Hampshire licensed federal firearms dealers (a.k.a. federal firearms licensees or FFLs).  She also reported that Audi N. Sumilat, the defendant, purchased firearms that he sent to a store where Sumual picked them up.

T.B. added that, after acquiring the firearms, Sumual drove them to Washington, D.C., where he delivered them to the persons she believed were members of the Indonesian Presidential Guard ("PG"), the protective detail for the President of the Republic of Indonesia.  T.B. recalled one instance in October 2015 when Sumual traveled to Washington, D.C., to deliver firearms while the President of Indonesia was on an official state visit to the White House.  She added that, on that occasion, Sumual took with him, a large locked bag, the contents of which he refused to disclose.  T.B. explained that she was providing the information to the police because she had come to the conclusion that Sumual was having an extra-marital affair and that he planned to leave for Indonesia, possibly on a permanent basis, on December 6, 2015.

During her interviews, T.B. also advised that she had seen Facebook text or message conversations between Sumual and at least one Indonesian PG member in which the PG member placed orders to purchase firearms from Sumual.  T.B. advised that she had taken pictures of those text or message conversations on her cell phone to preserve them.  Later, at the request of the police, she brought the cell phone on which she took the pictures to the police station, where the police then took their own pictures of the messages.  The messages, between Sumual and the other person, who was later confirmed to be a member of the Indonesian PG, reflect instructions to Sumual about what guns the PG member wanted Sumual to buy for him, information from Sumual about what firearms were available and at what prices and mutual remarks about how the PG member would pay Sumual for the firearms.  The individual involved in the messages who has been confirmed to be employed in the the Indonesian PG is Erlangga Perdana Gassing.

5

Sumual's relationships with Gassing is corroborated by Facebook posts. Gassing's employment with the Indonesian PG has been corroborated by Facebook posts, immigration and diplomatic records reflecting their visits to the U.S. as members of the PG and information from the Indonesian government.

Sumual's acquisition of a large quantity of firearms had caught the attention of the ATF even before T.B. first disclosed her husband's activities to the authorities. By the time T.B. first met with the Dover police, the ATF already had identified many of Sumual's firearms purchases and, among other investigative activities, had begun to collect the corresponding ATF Forms 4473, the official firearm transaction record for intrastate, over-the-counter sales that FFLs are required to maintain. 27 C.F.R. § 478.124. Form 4473 requires the purchaser of a firearm to, among other things, identify himself and his address, his place of birth and his state of residency. Form 4473 also contains a notification that it is illegal to purchase firearms for others. On the first page of the form, the buyer is asked: "Are you the actual transferee/buyer of the firearm?" That question is then followed by a warning in bold print that states "You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you." The Form also refers the purchaser to instructions for answering the question, which include simple examples of permissible and impermissible transactions. Finally, the purchaser's certification, which must be documented by his signature, explicitly states that falsely answering "yes" to the "actual buyer" question is a felony offense.

According to ATF Forms 4473 collected by ATF investigators both before and after T.B. began speaking with the police, Sumual amassed a total of at least twenty-one 9 mm hand guns during the period from September 21, and October 23, 2015. Many of the twenty-one firearms matched the makes and models of the firearms mentioned, and in some cases pictured, in the messages between Sumual and Gassing. The Forms 4473 collected by the ATF reflect that Sumual bought fifteen of the twenty-one firearms from New Hampshire FFLs – including State Line, KTP and Sig Sauer Academy. The Forms 4473 also reflect that Sumilat purchased five more guns from an FFL in Texas and shipped them, along with two additional firearms not originally purchased by Sumilat to Renaissance Firearms, an FFL in Rochester, New Hampshire where they were picked up by Sumual. According to the Thirty-Fifth Anniversary Edition Blue Book of Gun Values, by S.P. Fjestad, a recognized authority in handgun valuation, the websites of the handguns' manufacturers and a sporting goods retailer, the suggested retail prices for the twenty-two handguns total approximately $21,000. Each of the twenty-two firearms is designated as a defense article on the U.S. Munitions List and therefore cannot be exported without a license specifically covering that article.

The ATF soon learned that Sumual made important admissions in furtherance of his crimes to the owner of one of the FFLs.   According to both G.R, the owner of State Line and State Line's Forms 4473, Sumual purchased at least six firearms from State Line on October 9, 2015.   G.R. later told ATF investigators that, the following week, Sumual increased G.R.'s already raised suspicions when Sumual told him that Sumual wanted to purchase even more firearms.   G.R. said that when he asked Sumual why he was buying so many firearms, Sumual responded by saying that he was buying them for his brother-in-law – who he described as a secret service agent for the Prime Minister of Indonesia. G.R. added that Sumual told him that the Indonesian Prime Minister was coming to the U.S. soon and that his brother-in-law would be accompanying the Prime Minister as part of the Prime Minister's security detail.   Sumual told G.R. that he believed that the trip would occur during the period from about October 18 to October 31.   G.R. said that, after Sumual told him that Sumual was buying the firearms for his brother-in-law, he informed Sumual that he did not want to have anything to do with the transactions and that he did not want any further business from Sumual.

On each of the Forms 4473, Sumual identified himself by presenting his New Hampshire driver's license.   According to each of those forms, Sumual indicated that he was the actual purchaser of those firearms by answering "Yes" to question 11a:   "Are you the actual transferee/buyer of the firearm(s) listed on this form?   ATF investigators also obtained the ATF Forms 4473 for the five firearms that Sumilat purchased and shipped to Sumual.   According to each of those forms, the purchaser of each firearm identified himself by presenting Sumilat's military identification and Sumilat's driver's license. Sumilat indicated that he was the actual purchaser of those firearms by answering "Yes" to question 11a on each of the forms.

Sumual completed delivery of the firearms to members of the Indonesian PG.   Treasury Enforcement Communications System (TECS) and immigration records show that Gassing was in the U.S. at the relevant times.   Specifically, TECS records show that Gassing entered the United States on an Indonesian passport on September 20, 2015, and left on September 30, 2015.   Also, State Department records in support of Gassing's visa application for that visit show that he was in the United States on an "Official Visit," and described his work duties in the United States as, "Working visit to the Indonesian Permanent Mission to the United Nations in New York to attend the 70th Session of the United Nations General Assembly at U.N. Headquarters.   In addition, according to open source media accounts, including accounts from the <u>Washington Post</u>, the President of Indonesia was in the United States on an official state visit from October 25 to October 28, 2015.   Also, EZ Pass toll records and debit card records establish that Sumual traveled from N.H. to New York and to the Washington, D.C., area during those periods.   Vehicle toll records reflect that, after driving several hours to get there, Sumual stayed in New York

and the D.C. area as little as one hour before returning to N.H.    Finally, during the period from October 9 to October 23, Sumual received three wire transfers from Indonesia – in an approximate aggregate amount of $26,000 –and made large cash withdrawals that generally corresponded with payments for the guns that he purchased. Those transfers included transfers from two additional individuals who have been confirmed to be members of the Indonesian PG, Danang Praseto Wibowo and Arief Widyanto.    The Indonesian military police have recovered all or virtually all of the firearms in Indonesia.

After his arrest in Texas on the criminal complaint, Sumilat waived his <u>Miranda</u> rights in writing and, in a videotaped custodial interview, confessed fully.    While initially reticent, he eventually admitted to purchasing firearms and immediately shipping them to Sumual, knowing that Sumual would deliver the guns to visiting members of the Indonesian PG. He also admitted that he knew that PG members would then secretly export the guns to Indonesia.    Sumilat also divulged that he and members of the Indonesian PG – specifically Gassing, Wibowo and Widyanto, whom he identified from photographs -- hatched the entire plan during conversations they had after meeting in 2014 at Fort Benning, Georgia, where they were all receiving Army Ranger training together.    (Gassing, Wibowo and Widyanto were all apparently participating in an exchange program with the U.S. Army.) He also stated that he asked Sumual to participate in the plan and put Sumual and PG members in touch with each other.    Sumilat stated Sumual would finance his illegal gun purchases by depositing money into Sumilat's bank account which Sumilat withdrew by ATM to pay for the guns he purchased.    He also reported that he made between $200 and $300 per firearm, before shipping expenses.    Sumilat claimed that he believed that PG members wanted the firearms for sport shooting in Indonesia, but also reported that the PG members once asked Sumilat to get them conversion kits to turn the 9 mm hand guns into sub-machine guns.

The firearms Sumilat and Sumual purchased for the members of the Indonesian PG were included on the U.S. Munitions List and Sumilat and Sumual therefore needed an export license before they could legally export the firearms.    Sumilat, Sumual and none of the Indonesian PG members for whom they purchased the firearms have ever held, or even applied for, a license to export firearms.

    4.    <u>Penalties, Special Assessment and Restitution.</u>

The defendant understands that the penalties for the offense are:

    A.    A maximum prison term of five years (18 U.S.C. § 371);

B.      A maximum fine of $250,000 (18 U.S.C. § 3571); and

C.      A term of supervised release of not more than three (3) years.   The
defendant understands that the defendant's failure to comply with any
of the conditions of supervised release may result in revocation of
supervised release, requiring the defendant to serve in prison all or
part of the term of supervised release, with no credit for time already
spent on supervised release (18 U.S.C. §3583).

The defendant also understands that he will be required to pay a special assessment

of $100 at or before the time of sentencing; and that the Court may order him to pay

restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663 or § 3663A.

5.   Sentencing and Application of the Sentencing Guidelines.

The defendant understands that the Sentencing Reform Act of 1984 applies in this

case and that the Court is required to consider the United States Sentencing Guidelines as

advisory guidelines.   The defendant further understands that he has no right to withdraw

from this Plea Agreement if the applicable advisory guideline range or his sentence is other

than he anticipated.

The defendant also understands that the United States and the United States

Probation Office shall:

A.      Advise the Court of any additional, relevant facts that are presently
known or may subsequently come to their attention;

B.      Respond to questions from the Court;

C.      Correct any inaccuracies in the pre-sentence report;

D.      Respond to any statements made by him or his counsel to a probation

9

officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range under the advisory Sentencing Guidelines that he may have received from any source is only a prediction and not a promise as to the actual sentencing range under the advisory Sentencing Guidelines that the Court will adopt.

6. Sentencing Stipulations and Agreements.

Pursuant to Fed. R. Crim. 11(c)(1)(B), the government agrees to recommend a sentence at the middle of the applicable sentencing guideline range.

The parties are free to make recommendations with respect to the terms of imprisonment, fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7.   Acceptance of Responsibility.

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense.   The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

A.    Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

B.    Challenges the United States' offer of proof at any time after the plea is entered;

C.    Denies involvement in the offense;

D.    Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E.    Fails to give complete and accurate information about his financial status to the Probation Office;

F.    Obstructs, or attempts to obstruct, justice prior to sentencing;

G.    Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.    Fails to appear in court as required;

I.    After signing this Plea Agreement, engages in additional criminal conduct; or

J.    Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive a reduction in his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that the defendant has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and he has assisted the United

States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8.   Waiver of Trial Rights and Consequences of Plea.

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him. The defendant also understands that he has the right:

A.   To plead not guilty or to maintain that plea if it has already been made;

B.   To be tried by a jury and, at that trial, to the assistance of counsel;

C.   To confront and cross-examine witnesses;

D.   Not to be compelled to provide testimony that may incriminate him; and

E.   To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the foregoing rights and that upon the Court's acceptance of his guilty plea, he will not be entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions about the offense, and if he answers those questions falsely under oath, on the record, and

in the presence of counsel, his answers will be used against him in a prosecution for perjury or making false statements.

9.   Acknowledgment of Guilt; Voluntariness of Plea.

The defendant understands and acknowledges that he:

A.   Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because he is guilty;

B.   Is entering into this Plea Agreement without reliance upon any promise of benefit of any kind except as set forth in this Plea Agreement;

C.   Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D.   Understands the nature of the offense to which he is pleading guilty, including the penalties provided by law; and

D.   Is completely satisfied with the representation and advice received from his undersigned attorney.

11.  Scope of Agreement.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority. The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from his guilty plea.   The defendant understands such matters are solely within the discretion of the specific non-party government agency involved.   The defendant further acknowledges that this

Plea Agreement has been reached without regard to any civil tax matters that may be

13

pending or which may arise involving the defendant.

  12. <u>Collateral Consequences</u>.

  The defendant understands that, as a consequence of his guilty plea, he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

  13. <u>Satisfaction of Federal Criminal Liability; Breach</u>.

  The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire arising from his participation in the conduct that forms the basis of the Indictment in this case.   The defendant understands that if, before sentencing, he violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw therefrom.

14. <u>Waivers</u>.

    A.    Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or sentence on direct appeal.   By entering into this Plea Agreement the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

    1.    His guilty pleas and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

    2.    All aspects of the sentence imposed by the Court if it falls within, or lower than, the guideline range as determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of his rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel.

    B.    Collateral Review

The defendant understands that he may have the right to challenge his guilty plea and/or sentence on collateral review, e.g., pursuant to a motion under 28 U.S.C. §§ 2241 or 2255.   By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

    1.    His guilty pleas, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or

15

> any other adverse disposition of pretrial motions or
> issues; and

2.  All aspects of the sentence imposed by the Court if it falls within,
    or lower than, the guideline range as determined by the Court, or if
    it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of his right to collateral review does not operate to waive a collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel. The defendant's waiver of his right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant to pursue an appeal s authorized by law.

16

15.    Immigration Status.

The defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty.    Indeed, because of the nature of the offenses to which the defendant is pleading guilty, removal may be presumptively mandatory.    Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the U.S.

15.    No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

16.    Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant

17

United States Attorney.

    17.   <u>Agreement Provisions Not Severable</u>.

    The United States and the defendant understand and agree that if any provision of

this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is

null and void and no part of it may be enforced.

                    EMILY GRAY RICE
                    United States Attorney

Date:  July 5, 2016        By:   _Will E. Morse_____
                    William E. Morse
                    Assistant U.S. Attorney
                    Bar # 421934 (D.C.)
                    53 Pleasant St., 4th Floor
                    Concord, NH   03301

    The defendant, Audi N. Sumilat, certifies that he has read this 18-page Plea
Agreement and that he fully understands and accepts its terms.

Date:  July __, 2016          _____
                    Audi N. Sumilat, Defendant

    I have read and explained this 18-page Plea Agreement to the defendant, and he
has advised me that he understands and accepts its terms.

Date:  July 5, 2016          _____
                    Richard F. Monteith, Jr., Esquire
                    Attorney for Audi N. Sumilat